**Inquiry into the CONDUCT OF the Honorable Patricia Kerr KARASOV.**

**No. A10–1746.**

Supreme Court of Minnesota.

Nov. 16, 2011.

Douglas A. Kelley, Steven E. Wolter, Kelley, Wolter & Scott, P.A., Minneapolis, MN, for the Board on Judicial Standards.

David F. Herr, Maslon, Edelman, Borman & Brand, LLP, Minneapolis, MN, for the Honorable Patricia Kerr Karasov.

## OPINION

PER CURIAM.

This proceeding arises from a formal complaint filed by the Minnesota Board on Judicial Standards against the Honorable Patricia Kerr Karasov, Judge of District Court, Hennepin County, alleging violations of the Rules of the Code of Judicial Conduct and the Minnesota Constitution.

Following a hearing, a three-member panel appointed by this court found that Judge Karasov failed to reside within her judicial district from July 1, 2009, through September 30, 2009, and failed to cooperate and be candid and honest with respect to the Board's investigation of her residency status, in violation of Rules 1.1, 1.2, and 2.16 of the Code of Judicial Conduct and Article VI, Section 4, of the Minnesota Constitution. The panel recommended that Judge Karasov be censured and suspended from judicial office for 90 days without pay. Judge Karasov appealed the panel's findings, contending the Board failed to prove that she committed judicial misconduct by clear and convincing evidence and that she was denied due process of law by irregularities in the proceedings and errors of law. Both Judge Karasov and the Board appealed the panel's recommended sanctions.

We conclude that the Board has proven by clear and convincing evidence that Judge Karasov failed to reside within her judicial district during her continuance in office and that she failed to cooperate and be candid and honest with respect to the Board's investigation of her residency status, in violation of Rules 1.1, 1.2, and 2.16 of the Code of Judicial Conduct and Article VI, Section 4, of the Minnesota Constitution. We further conclude that Judge Karasov's due process claims lack merit. Finally, we conclude that the appropriate judicial discipline is censure and suspension from judicial duties for 6 months without pay.

*Procedural Background*

On August 24, 2010, the Board filed a formal complaint against Judge Karasov, alleging that she had violated the Minnesota Constitution and Rules 1.1, 1.2, and 2.16 of the Code of Judicial Conduct. The formal complaint alleged that Judge Karasov failed to reside in the Fourth Judicial Dis-

trict throughout her entire term of judicial office by residing at her home in Chisago City beginning in April 2008. The formal complaint also alleged that Judge Karasov failed to be fully cooperative, candid, and honest with the Board and its investigators.[1] We appointed a three-member fact-finding panel to conduct a hearing on the Board's allegations.

*Hearing Before the Three–Member Panel*

A hearing was held before the three-member panel for 3 days in January 2011. The testimony at this hearing, as well as the exhibits admitted into evidence, establish the following. Judge Karasov is a district court judge in the Fourth Judicial District, a position to which she was elected in 1994, and reelected in 2000 and 2006.

Since 2001, Judge Karasov has owned a townhome in Edina, which is within her judicial district. She thereafter lived in that townhome except for the time period from July 1, 2009, through June 30, 2010, during which time she rented out the townhome pursuant to a written lease. Also, since at least 2001, Judge Karasov was registered to vote in Edina, listed the townhome's address or her work address in the Hennepin County Government Cen-

ter on her driver's license, maintained property insurance for the townhome, and used the townhome address to register her vehicles. Judge Karasov was a member of a synagogue in Minneapolis, also within her judicial district, where she taught religious education classes.

On February 1, 2007, Judge Karasov and C.C. purchased as tenants in common a lake home in Chisago City ("the lake home"), which is outside of the Fourth Judicial District. Judge Karasov considered the lake home an investment and hoped to live there in retirement. C.C. and her daughter moved into the lake home. Judge Karasov spent many weekends and vacations at the lake home. In addition, Judge Karasov often spent time in Chisago City visiting her ailing father, who began living in senior housing in Chisago City in January 2007 and remained there until his death in September 2010.

Judge Karasov began trying to sell her Edina townhome in March 2008. She wanted to downsize after her younger daughter graduated from high school that spring, and she also found it expensive to own two properties.

In April 2008, Judge Karasov received an offer to buy her townhome, but the

---

1. The Board also alleged that Judge Karasov violated Rules 2.1 and 3.1(C) of the Code of Judicial Conduct. Rule 2.1 states, "[t]he duties of judicial office, as prescribed by law, shall take precedence over all of a judge's personal and extrajudicial activities," while Rule 3.1(C) states, "a judge shall not ... participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality." The panel did not make any findings or conclusions regarding the Board's allegation of these rule violations, and so we do not discuss these allegations further. With respect to the Board's noncooperation allegation, the formal complaint alleged that Judge Karasov failed to sign authorization forms giving the Board access to information from her credit card companies in a timely manner. After Judge

Karasov's former counsel testified before the panel that any delay in providing these signed authorization forms to the Board was attributable to his law firm, the Board withdrew its allegation related to the authorization forms. The formal complaint also alleged that Judge Karasov claimed a homestead status for her townhome in Edina during 2009 when she did not personally occupy the townhome and that Judge Karasov failed to provide notice to the assessor of her rental agreement for the townhome. In its findings, the panel explained that the allegation related to the homestead status appeared to have been withdrawn, as the Board did not address this allegation in its final submissions. The panel also concluded that the evidence offered at the hearing did not support this allegation.

offer was withdrawn later that month. Afterward, Judge Karasov continued to try to sell her townhome. She reduced clutter in the townhome, in the hopes of making it look more appealing to buyers, by moving belongings into a storage unit and giving some furniture to her older daughter.

Around this same time, Judge Karasov spoke with a friend, M.L., about renting a room in her Bloomington home, which is in the Fourth Judicial District. M.L. was receptive to the idea. The two casually discussed which bedroom Judge Karasov would use, whether she would bring any of her own furniture, and the amount of rent she would pay. After the purchase agreement for her townhome was withdrawn, Judge Karasov did not discuss renting a room with M.L. until after she entered into the rental agreement for her townhome.

After a year of being unable to sell her townhome, Judge Karasov began to search for a renter. On May 9, 2009, renters signed a 1–year lease for her townhome that began July 1, 2009. On June 6, 2009, Judge Karasov hired a professional moving company to move items from her townhome to her lake home.

In the summer of 2009, Judge Karasov spoke again with M.L. about renting a room in her house. M.L. said yes, but no aspect of a rental agreement was finalized. M.L. later requested that Judge Karasov wait to move in until after M.L.'s son moved away to college at the end of August. Then, in late July or early August, M.L. told Judge Karasov she could not rent space in her house.

Beginning July 1, 2009, Judge Karasov stayed at her lake home. By her own admission at the hearing, Judge Karasov stayed at the lake home from July 1, 2009, through the end of September 2009.

Judge Karasov did not use any commercial means, such as an apartment finding service, to find an apartment or a room to rent in her judicial district. Instead, Judge Karasov contacted two other friends who lived in Hennepin County, which is within her judicial district, about renting from them.

Judge Karasov had previously discussed renting a room in the home of a friend, B.O., who lived in Maple Grove, but the record does not reflect precisely when this discussion occurred. In an e-mail on July 30, 2009, Judge Karasov again brought up the possibility of renting a room from B.O., but Judge Karasov did not pursue the matter with B.O.

Judge Karasov also had discussions with another friend, M.A., about renting all or part of her home in south Minneapolis. At the time of these discussions, M.A. had been trying to rent her home over the internet. Judge Karasov, however, did not want to pay as much money as M.A. was asking. On August 25, 2009, Judge Karasov sent M.A. an e-mail stating, "[d]id you ever find a 'real' renter? If not, I would still be interested in working something out with cash. A utility bill and cat sitting? ?!!" In an e-mail on August 31, 2009, M.A. talked about the possibility of Judge Karasov renting her house Monday through Thursday for $250 plus the electric bill. M.A. said, "if you decide to rent from me, you could start using the address immediately, but I won't charge rent until 10/1." As of August 31, 2009, Judge Karasov had never been inside M.A.'s home. In a September 9, 2009, e-mail, Judge Karasov told M.A. that she was not interested in renting M.A.'s house because "[m]y daughter wants me to be on her lease in Minneapolis which I think I am going to do because I give her money anyway."

Judge Karasov's daughter and her daughter's friend began renting a two-bedroom apartment on Fremont Avenue

South ("the Fremont Avenue apartment") in Minneapolis on August 1, 2009. The rent for the apartment was $860 per month.

During the 2009 Minnesota State Fair, Judge Karasov and her daughter discussed sharing the Fremont Avenue apartment. Judge Karasov's daughter told her mom that her roommate was not helping to pay the bills, and she asked her mom to help. Judge Karasov's daughter also talked with her roommate about sharing the apartment with her mom, and her roommate said it was fine with her, but they needed to talk to the rental agent.

Judge Karasov's daughter testified that Judge Karasov told her how often Judge Karasov expected to stay at the Fremont Avenue apartment. Judge Karasov's daughter explained that Judge Karasov told her that she needed a place to stay on her bowling night, as well as on the weekends if there was bad weather and she did not want to go to her lake home.

Judge Karasov claimed to have moved into the Fremont Avenue apartment in September 2009. The panel "reject[ed] as not credible Judge Karasov's testimony that she began to reside with [her daughter] at the Fremont Avenue apartment in the middle of September."

On September 29 or 30, 2009, Judge Karasov's daughter and her roommate met with their apartment manager to ask about adding Judge Karasov to the lease. Judge Karasov's daughter told the apartment manager that she did not know how often Judge Karasov would be staying at the Fremont Avenue apartment and asked if they had to pay another deposit. Judge Karasov's daughter also told the apartment manager that her mother needed a Hennepin County address to continue being a judge, but that her mother would only stay in the apartment if there was a blizzard or something.

On October 1, 2009, Judge Karasov met with the apartment manager and signed a lease for the Fremont Avenue apartment. When Judge Karasov was added to the lease, the rent for the Fremont Avenue apartment increased from $860 to $885 per month. Judge Karasov paid only the $25 difference between the old and new rent amounts. Judge Karasov moved bookcases, end tables, clothes, and bathroom items into the apartment. She slept on an air mattress. Judge Karasov used a suitcase to bring items with her when she stayed in the apartment.

The hearing before the three-member panel also addressed the Board's investigation of Judge Karasov. Initially, at a May 29, 2009, meeting of the Board on Judicial Standards, a Board member reported that Judge Karasov might be living outside of Hennepin County. This member stated the source of the information was a practicing lawyer who requested anonymity. The Board authorized a preliminary investigation of the allegations, and an outside firm conducted that investigation. Judge Karasov was not provided any notice of this preliminary investigation. When the preliminary investigation showed grounds for further pursing the matter, the Board hired outside counsel to assist. The Board did not inform Judge Karasov that it had hired outside counsel to assist with its investigation into her residency.

In a letter dated September 28, 2009, the Board's Executive Secretary informed Judge Karasov that the Board had received "an anonymous complaint. The complaint alleges that you are not a resident of the district in which you serve." The letter cited a number of provisions of the Code of Judicial Conduct, as well as the section of the Minnesota Constitution regarding the residency of district court judges. It stated, "[t]he Board, having

now initially considered the matter, respectfully invites you to file a written response." The letter cited several provisions in Rule 6(d) of the Rules of the Board on Judicial Standards, which addresses investigations by the Board, and informed Judge Karasov that she was required to respond within 30 days of receiving the notice. The letter further stated that "before the Board 'determines its disposition of the inquiry,'" Judge Karasov could "appear before the Board to 'respond to questions.'"

Judge Karasov received this letter on September 30, 2009. In a letter to the Board's Executive Secretary dated October 6, 2009, Judge Karasov said the Fremont Avenue apartment was her "current address." She stated, "I am renting this apartment with two roommates. Since being the victim of a stalker in 2001, I moved my residence and since that time I have kept my address and personal living situation non-public and confidential, except from my friends." She also explained that she continued to own a home in Hennepin County "that is currently rented out after being on the market for sale for over a year."

On November 24, 2009, Judge Karasov spoke by telephone with outside counsel for the Board, who told Judge Karasov he was representing the Board and investigating the allegations about her residency. Judge Karasov was asked if she had ever lived outside her judicial district. In response, Judge Karasov said, "I have not lived outside the district."

On August 3, 2010, Judge Karasov and her counsel met with the Board's counsel and his investigator. During this interview, Judge Karasov was asked if she had ever lived outside of the Fourth Judicial District. Judge Karasov said she had not lived outside her judicial district, except temporarily in Chisago City from July 1, 2009, to the second or third week of September 2009, which is when she moved into the Fremont Avenue apartment. Judge Karasov said that during the July–September 2009 period, she resided at her lake home.

At this interview, the Board's counsel also asked for more information about the stalker mentioned in Judge Karasov's October 6, 2009, letter. Judge Karasov said the stalker was a former boyfriend who appeared in her bedroom one morning and threatened her. When she was asked directly to identify the person involved in the 2001 stalking incident, Judge Karasov refused to do so.

*The Three–Member Panel's Findings and Recommended Sanction*

The panel concluded that the Board proved by clear and convincing evidence that Judge Karasov was not a resident of her judicial district from July 1, 2009, through September 30, 2009.[2] Specifically, the panel found:

During this time period, Judge Karasov did not have a place to live within the district, and the panel reject[ed] as not credible Judge Karasov's testimony that she nonetheless intended to continue her residence within the judicial district during this time period. Judge Karasov's

2. The panel found that "[w]hile there is evidence to support the board's allegations that Judge Karasov was not a resident of her judicial district for a time before July 1, 2009 and after September 30, 2009, those allegations are not supported by clear and convincing evidence." The Board has not appealed the panel's conclusions with respect to Judge Ka- rasov's residency either before July 1, 2009, or after September 30, 2009. Because no one has appealed these conclusions by the panel, we have not discussed in this opinion all of the .evidence the Board presented regarding Judge Karasov's residency before July 1, 2009, or after September 30, 2009.

failure to take reasonable steps to find a place to live within the district and her conduct in relation to the board's investigation belies her professed intent.

The panel concluded that by "failing [to] reside within her judicial district during the period of July 1, 2009, through September 30, 2009, Judge Karasov has violated Article VI, Section 4, of the Minnesota Constitution" and Rules 1.1 and 1.2 of the Code of Judicial Conduct.

The panel also concluded that the Board had proved by clear and convincing evidence that Judge Karasov violated Rule 2.16 of the Code of Judicial Conduct by failing to cooperate and be candid and honest with respect to the Board's investigation. The panel found that at the time she received the Board's letter informing her of the complaint about her residency, Judge Karasov did not have a place to live within her judicial district. The panel further determined that Judge Karasov omitted material information from her October 6 letter to the Board about where she was living. The panel concluded that the letter was "a carefully worded and calculated attempt to evade further inquiry by the board into Judge Karasov's residency status." The panel also concluded that Judge Karasov gave inconsistent responses to the question of whether she had ever lived outside of her judicial district; she told the Board's counsel on November 24, 2009, that she had never lived outside of her district, but later said in an August 3, 2010, interview that she had lived outside of the district temporarily, from July 1, 2009, until the second or third week of September

2009. Finally, the panel found that Judge Karasov refused to provide the identity of the stalker who she claimed had caused her to keep her address confidential when "the identity of the stalker was material to the board's investigation."

For these violations, the panel recommended that Judge Karasov be censured and suspended from judicial office without pay for 90 days.

I.

■■■ Under Rule 4(a)(6), Rules of the Board on Judicial Standards, "[c]onduct that constitutes a violation of the Code of Judicial Conduct" is a ground for judicial discipline. The Board has the burden of proving by clear and convincing evidence that a judge engaged in misconduct. Rule 10(b)(2), Rules of the Board on Judicial Standards; *In re Blakely*, 772 N.W.2d 516, 522 (Minn.2009). Clear and convincing evidence requires that "the truth of the facts asserted is 'highly probable.'" *In re Miera*, 426 N.W.2d 850, 853 (Minn.1988) (quoting *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn.1978)).

■■■ We make an independent assessment of whether the Board has proven that a judge violated a provision of the Code of Judicial Conduct. *See* Rule 14(e), Rules of the Board on Judicial Standards; *see also In re Blakely*, 772 N.W.2d at 522; *In re Murphy*, 737 N.W.2d 355, 361–66 (Minn.2007); *In re Miera*, 426 N.W.2d at 853–57. In so doing, we "giv[e] deference to the facts" found by the panel.[3] Rule

**3.** This language in Rule 14(e) was added in rule changes that were effective July 1, 2009. Prior to that time, the Rules of the Board on Judicial Standards contained no provision discussing what, if any, deference the court was required to give the panel's factual findings. *See* Rule 13(f), Rules of the Board on Judicial Standards (2008). Prior decisions indicated that we were not required to give deference to the panel's factual findings and suggested that we could reach our own factual conclusions. *See In re Murphy*, 737 N.W.2d at 361; *In re Miera*, 426 N.W.2d at 855; *In re McDonough*, 296 N.W.2d 648, 691 (Minn.1979). Given this rule change, these cases no longer accurately state the standard

14(e), Rules of the Board on Judicial Standards. Accordingly, we will defer to the panel's factual findings unless they are clearly erroneous. *Cf. In re Pinotti,* 585 N.W.2d 55, 62 (Minn.1998) (holding that in attorney discipline cases, we uphold a referee's factual findings unless they are clearly erroneous).

The Board contends that Judge Karasov engaged in judicial misconduct by residing outside of her judicial district between July 1, 2009, and September 30, 2009, and by failing to fully cooperate and be candid and honest with the Board and its investigators. Judge Karasov disputes that the Board has proven by clear and convincing evidence that she engaged in any judicial misconduct. Applying the standard of review just articulated, we consider each claim of judicial misconduct in turn.

## II.

We turn first to the charge that Judge Karasov violated Rules 1.1 and 1.2 of the Code of Judicial Conduct and Article VI, Section 4, of the Minnesota Constitution by failing to reside within her judicial district during the period from July 1, 2009, through September 30, 2009.[4] The Minnesota Constitution provides that "[e]ach judge of the district court in any district shall be a resident of that district at the time of his selection and during his continuance in office." Minn. Const. art. VI, § 4.

We have not previously interpreted the residency requirement for district court judges in the Minnesota Constitution. But we have interpreted a similar constitutional residency requirement. Under Article IV, Section 6 of the Minnesota Constitu-

tion, "[s]enators and representatives shall be qualified voters of the state, and shall have resided one year in the state and six months immediately preceding the election in the district from which elected."

■ In deciding whether a legislative candidate has resided in the district from which elected, as required by the Minnesota Constitution, we "focus on physical presence and intent, as we have done in the voter residency context." *Piepho v. Bruns,* 652 N.W.2d 40, 44 (Minn.2002); *see also Studer v. Kiffmeyer,* 712 N.W.2d 552, 557 (Minn.2006). We have not adopted outright the statutory residency principles established for voters in Minn.Stat. § 200.031 (2010), when interpreting the constitutional requirement for legislators. But we have said that "the concept of residency is captured and perhaps best summarized" in that statute. *Piepho,* 652 N.W.2d at 44. Under that statute, "the mere intention to acquire a new residence, is not sufficient to acquire a new residence, unless the individual moves to that location; moving to a new location is not sufficient to acquire a new residence unless the individual intends to remain there." Minn. Stat. § 200.031(i) (2010). With this statutory guidance in mind, we have "conclude[d] that the foremost considerations with respect to residency in the election context are physical presence and intent." *Piepho,* 652 N.W.2d at 44. The two factors "inform[ ]" each other and "neither factor is determinative." *Id.* In other words, "intent can be demonstrated in many ways, including but not limited to physical presence, and we consider physical presence to the extent that it manifests

of review regarding the panel's factual findings.

4. Rule 1.1 of the Code of Judicial Conduct states, "[a] judge shall comply with the law, including the Code of Judicial Conduct." Rule 1.2 of the Code of Judicial Conduct

states, "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

intent to reside in the district." *Id.* Finally, our precedent recognizes that the factors that establish residency are "largely questions of fact." *Studer,* 712 N.W.2d at 558 (quoting *Piepho,* 652 N.W.2d at 44–45).[5]

■ We conclude that the test for determining whether a legislator has resided in a legislative district, as required by Article IV, Section 6, of the Minnesota Constitution, should also apply in determining whether a district court judge complies with the residency requirement of Article VI, Section 4, of the Minnesota Constitution. Both constitutional provisions use similar language and involve the same subject matter. Thus, in order to determine whether Judge Karasov resided outside of her judicial district in the summer of 2009 after she rented out her Edina townhome, we will focus on Judge Karasov's physical presence and intent to reside.

■ Judge Karasov contends her actions demonstrate her strong intent to remain a resident of her judicial district. She argues that she intended to remain a resident of Hennepin County after renting out her Edina townhome and that she had to temporarily and unexpectedly stay at her lake home beginning July 1, 2009, because her friend in Bloomington, M.L., asked her to delay moving into M.L.'s house until August 2009. And when M.L. told Judge Karasov she could not move

into her house, Judge Karasov argues that she quickly resolved "her residency issue" by agreeing to move in with her daughter.

The Board argues that Judge Karasov's words and actions lead to the inescapable conclusion that Judge Karasov resided outside of her district during the period of July 1, 2009, through September 30, 2009. The Board notes that, by her own admission, Judge Karasov stayed at her lake home without any corresponding Hennepin County address for approximately 3 months from July 1, 2009, through the end of September 2009. The Board also points to the timing between when Judge Karasov received the Board's letter and when Judge Karasov's daughter asked her apartment manager if Judge Karasov could be added to the lease. And the Board contends that Judge Karasov's actions and statements prove she was only seeking a sham address in Hennepin County.

The panel concluded that the Board proved by clear and convincing evidence that Judge Karasov resided outside of her judicial district from July 1, 2009, through September 30, 2009, in violation of Article VI, Section 4, of the Minnesota Constitution. We agree. It is at least highly probable, based on the factors of physical presence and intent, that Judge Karasov was residing at her lake home in Chisago City, and therefore outside her judicial district, during this period.[6]

---

**5.** Most of the cases addressing the residency requirement for legislators have focused on whether a candidate successfully established a new residence by changing where he or she was living. *See Studer,* 712 N.W.2d at 554. Many involved candidate challenges that occurred when incumbent legislators changed their residences after a decennial legislative redistricting because they no longer lived in the newly-defined district. *Piepho,* 652 N.W.2d at 45; *Olson v. Zuehlke,* 652 N.W.2d 37, 38–39 (Minn.2002).

**6.** Whether a district court judge has violated the Minnesota Constitution's residency requirement is a highly fact-specific inquiry. In this opinion, we are deciding, based on the specific facts of this case, whether the Board proved by clear and convincing evidence that Judge Karasov failed to reside within her judicial district. Our opinion should not be read to address whether any other out-of-district living arrangement by a district court judge would violate the Minnesota Constitution's residency requirement.

With respect to physical presence, the record supports the panel's finding that Judge Karasov lived at the lake home during this 3–month period. She owned the lake home and had moved her furniture and belongings there. Judge Karasov also admitted that she "stayed" at the lake home during this period. Finally, as the panel found, Judge Karasov had no place to live in her judicial district during this period.

Regarding intent, the record strongly demonstrates that Judge Karasov intended to remain at her lake home and that it was the Board's investigation of her that caused her to change her plans. Judge Karasov did not have a place to live in Hennepin County until the day after she received a letter from the Board informing her that the Board was investigating a complaint alleging she was residing outside of her district. As the panel found, it was only after she received this letter that Judge Karasov was added to the lease of her daughter's apartment on Fremont Avenue.

Also relevant to intent is the panel's finding that Judge Karasov "fail[ed] to take reasonable steps to find a place to live within the district."[7] The record supports this finding. Specifically, the record es-tablishes that Judge Karasov did not make reasonable efforts to find housing in her judicial district during the summer of 2009 prior to receiving the Board's letter. Judge Karasov had ample time to secure a new residence in her judicial district after signing a lease for her Edina townhome, but she made deliberate choices not to do so. There was a 2–month period between when Judge Karasov signed the lease for her Edina townhome and when her renters moved into it. While M.L. may have told Judge Karasov during this period that she could rent a room in M.L.'s house, no lease or actual rental agreement was ever finalized. *See Melendez v. O'Connor,* 654 N.W.2d 114, 118 (Minn.2002) (stating that "a mere intention of establishing residency in a particular district without actually having a physical location in the district at which to establish residency is not sufficient"). In fact, the record establishes that the two did not even discuss rent during this 2–month period and that Judge Karasov was willing to pay very little to rent a room. Judge Karasov's claim that she thought she was going to move into M.L.'s house when her renters moved into her townhome is belied by her failure to enter into a rental agreement with M.L. or even work out key terms of such an agree-

---

7. The concurrence contends that we are "incorrectly interpret[ing] the residency requirement" by relying on Judge Karasov's lack of reasonable efforts to secure a place to live in her judicial district during the summer of 2009 as evidence of her intent to remain and reside at her lake home. According to the concurrence, "[t]he issue is Judge Karasov's intent, not the methods she used" to find housing in her judicial district. Intent, however, is often proved circumstantially by looking at a person's conduct and inferring from that conduct a person's mental state. *Stiles v. State,* 664 N.W.2d 315, 320 (Minn.2003) (holding in an intentional murder case that "[i]ntent can be inferred from the words and acts of the shooter before and after the incident"); *State v. Rhodes,* 657 N.W.2d 823, 840 (Minn.2003) (holding that intent may be proven circumstantially and "may be inferred from events occurring before and after the crime"); *Florenzano v. Olson,* 387 N.W.2d 168, 173 (Minn.1986) (holding in a civil fraud case that fraudulent intent "is normally established through circumstantial evidence"). In keeping with this well-settled law, we look to Judge Karasov's conduct during the time in question to determine her intent. And the quality of Judge Karasov's efforts to find somewhere to live within her judicial district, after she voluntarily chose to rent out her townhome and move her belongings to and live at her lake home, is highly probative of whether Judge Karasov was only temporarily staying at her lake home or whether she intended to remain and reside at her lake home.

ment. *See Piepho,* 652 N.W.2d at 42, 45 (concluding that evidence of intent to reside included fact that legislator entered into 12–month lease in new legislative district); *Olson,* 652 N.W.2d at 40 (concluding that evidence of intent to reside included signing purchase agreement for a home in the new legislative district).

Judge Karasov also did not take reasonable steps to find another place to live in her judicial district after M.L. withdrew her offer to rent a room to Judge Karasov. Judge Karasov did not use any commercially available means to find an apartment or room to rent in Hennepin County. Instead, Judge Karasov sent one e-mail to B.O., a friend who lived in Maple Grove; she had discussions about renting M.A.'s Minneapolis home without ever visiting the house; and she offered to pay M.A. rent in the form of a utility bill and cat sitting.[8] It also took nearly a month for Judge Karasov to be added to the lease for the Fremont Avenue apartment after she and her daughter initially talked about sharing the apartment. By failing to take reasonable steps to find a new place to live in Hennepin County, Judge Karasov revealed

her intent to remain and reside at her lake home in Chisago City.

Finally, Judge Karasov's statements prior to receiving the Board's letter about the housing she was seeking in her judicial district demonstrate that Judge Karasov did not intend to actually live in this housing.[9] *See Studer,* 712 N.W.2d at 558–59 (indicating that a candidate's statements to others about where she lived are strong evidence of where a candidate intends to reside). Judge Karasov told her daughter that she would only stay at the Fremont Avenue apartment on bowling nights and if there was inclement weather. Statements in e-mails with M.A. convey a similar intent not to live at M.A.'s house. Judge Karasov did not consider herself to be a "real" renter, and M.A. offered to let Judge Karasov use her "address" before she paid any rent. By telling others that she did not intend to live at a new address in her judicial district, Judge Karasov confirmed her intent to reside at her lake home.

We acknowledge Judge Karasov testified it was always her intention to remain a resident of Hennepin County. Nonetheless, the panel found this testimony not

---

8. The concurrence's assertion that Judge Karasov and M.A. were "close to an agreement on rental terms" when Judge Karasov decided to move in with her daughter is not supported by the record. Instead, the record indicates that there was a substantial gulf between the two regarding rent. M.A. wanted substantially more in rent than what Judge Karasov wanted to pay. They also had not agreed on whether Judge Karasov would only rent the house during the week. Nothing in the record suggests that Judge Karasov and M.A. were close to an agreement on rental terms.

9. The concurrence contends that "it defies logic to conclude that Judge Karasov's efforts leading up to her signing the lease and moving in with her daughter do not show an intent to remain a resident of the district" because the panel found "that upon signing

the lease and making arrangements to move in with her daughter, there was no longer clear and convincing evidence that Judge Karasov was not a resident of the Fourth Judicial District." The concurrence ignores a key fact—Judge Karasov's receipt of the Board's letter (informing her that the Board had received a complaint that she was not residing in her judicial district) shortly before signing the lease for and moving into the Fremont Avenue apartment. As we have more fully explained, there is clear and convincing evidence that Judge Karasov resided at her lake home in Chisago City and intended to remain there during the period of July 1, 2009, through September 30, 2009, and that it was learning of the Board's investigation of her residency that caused Judge Karasov to change her intent to remain at her lake home.

credible when viewed in the context of Judge Karasov's actions. The panel's finding was not clearly erroneous.[10]

When we consider the factors of physical presence and intent, we conclude that the Board established by clear and convincing evidence that Judge Karasov did not reside in her judicial district from July 1, 2009, to September 30, 2009, in violation of Minn. Const. art. VI, § 4. By not residing in her judicial district during this period, Judge Karasov created the appearance of impropriety and did not act in a manner that promotes public confidence in the integrity of the judiciary because she acted in a manner suggesting that constitutional requirements do not apply to her. We therefore hold that Judge Karasov's conduct was a violation of Rules 1.1 and 1.2 of the Code of Judicial Conduct.

### III.

We next address the Board's allegation that Judge Karasov failed to cooperate and be candid and honest with the Board, in violation of Rule 2.16(A) of the Code of Judicial Conduct, based on her October 6, 2009, letter to the Board and her conversation with the Board's counsel on November 24, 2009. The Board further contends that Judge Karasov violated Rule 2.16(A) by failing to reveal the name of a stalker whom she alleged caused her to keep her address confidential.

Rule 2.16(A) of the Code of Judicial Conduct states, "[a] judge shall cooperate and be candid and honest with judicial ... disciplinary agencies." A duty to be candid and honest with judicial disciplinary agencies requires a judge to be truthful and to refrain from being dishonest and making deliberately false statements to the Board and its agents. *See In re King*, 857 So.2d 432, 449 (La.2003) ("As recognized by other jurisdictions, [h]onesty is a minimum qualification expected of every judge." (citation omitted) (internal quotation marks omitted)); *Webster's Third New Int'l Dictionary*, 325, 1086 (1961) (defining "candid" as "indicating or suggesting sincere honesty and absence of deception and duplicity" and defining "honest" as "free from fraud or deception: legitimate, truthful"). This duty also includes a duty not to make material omissions dur-

---

10. The concurrence suggests that we are ignoring the following undisputed evidence demonstrating Judge Karasov's intent to remain a resident of her assigned judicial district after she rented out her townhome: Judge Karasov made some effort to find a place to live in her judicial district; Judge Karasov continued to own a townhome in her judicial district; Judge Karasov listed the address of her townhome on her driver's license and was registered to vote there; and Judge Karasov continued to work and participate in social and religious activities in her judicial district. Because of this evidence, the concurrence concludes that the Board failed to prove by clear and convincing evidence that Judge Karasov did not reside in her judicial district from July 1, 2009, through September 30, 2009. The panel, however, found that Judge Karasov's professed intent to remain a resident of her judicial district was belied by her "failure to take reasonable steps to find a place to live within the district and her conduct in relation to the board's investigation." This finding is not clearly erroneous, nor does the concurrence suggest that it is. The concurrence is impermissibly weighing the evidence and substituting its judgment for that of the panel's regarding Judge Karasov's intent. Moreover, the Board's burden of proof is clear and convincing evidence, which is a lower standard than proof beyond a reasonable doubt. *State v. Miller*, 754 N.W.2d 686, 701 (Minn.2008). The Board did not have to disprove all reasonable doubt regarding Judge Karasov's intent. Instead, the Board was required to prove that it was "highly probable" that Judge Karasov did not reside in her judicial district during the period of July 1, 2009, through September 30, 2009, based on her physical presence and intent. *See In re Miera*, 426 N.W.2d 850, 853 (Minn.1988) (defining clear and convincing evidence standard).

ing a disciplinary investigation. *See Adams v. Comm'n on Judicial Performance,* 10 Cal.4th 866, 42 Cal.Rptr.2d 606, 897 P.2d 544, 568 (1995) (disciplining a judge for making false statements and material omissions during a judicial disciplinary investigation); *see also Heidbreder v. Carton,* 645 N.W.2d 355, 367 (Minn.2002) ("A misrepresentation may be made by an affirmative statement that is itself false or by concealing or not disclosing certain facts that render facts disclosed misleading.").

The panel found that "Judge Karasov failed to cooperate and be candid and honest with judicial disciplinary agencies." The record supports this finding. Specifically, the Board proved that Judge Karasov was not candid and honest when she told counsel for the Board on November 24, 2009, that she had not lived outside of her district. Judge Karasov admitted during her testimony that she told the Board's counsel on November 24, 2009, that she had not lived outside the district. This statement is an affirmative misrepresentation. Judge Karasov lived at her Chisago City lake home from July 1, 2009, through the end of September 2009, and she had no residence in her judicial district available to her during this period.

Additionally, the panel found that Judge Karasov failed to disclose material information in her October 6, 2009, letter to the Board. The record supports this finding. In that letter, Judge Karasov stated that her "current address" was the Fremont Avenue apartment and that her Edina townhome was rented. When she received the Board's letter on September 30, Judge Karasov was not yet living in the Fremont Avenue apartment. In her letter, Judge Karasov did not disclose that she had signed the lease on the Fremont Avenue apartment on October 1, that the other lessees were her daughter and her daugh-

ter's roommate, that she was paying only $25 in rent for that apartment, that her Edina townhome had been rented out for 3 months, or that she had stayed at her lake home outside of her judicial district from July 1, 2009, to September 30, 2009. The omission of these facts rendered her statement that her "current address" was the Fremont Avenue apartment misleading. By omitting these material facts regarding her residency in her judicial district, Judge Karasov failed to cooperate and be candid with the Board.

Judge Karasov makes two arguments to support her claim that the Board failed to prove that she violated Rule 2.16(A). First, Judge Karasov contends that the Board agreed to strike the only allegation of noncooperation alleged in the formal complaint, which was a claim that she failed to sign certain releases for financial records. The formal complaint, however, contained allegations about Judge Karasov's October 6, 2009, letter that referenced specific statements in the letter and about her conversation with the Board's counsel on November 24, 2009, that referenced her statement that she had not lived outside of the district. The formal complaint also contained allegations about admissions Judge Karasov made about where she had been living in the summer of 2009 that were inconsistent with what she said in her letter and in her November 24 statement to the Board's counsel. In short, the formal complaint's allegation that Judge Karasov violated Rule 2.16(A) included Judge Karasov's representations in her October 6 letter and in her November 24 statement.

Second, Judge Karasov argues that her October 6 letter cannot form the basis of a violation of Rule 2.16(A) because she was unaware the Board was investigating her when she sent her October 6 letter in response to the Executive Secretary's

letter. Rule 2.16(A) requires a judge to "cooperate and be candid and honest with judicial . . . disciplinary agencies." It does not say a judge has this duty only after he or she knows the Board has decided to formally investigate the judge. Moreover, the Executive Secretary's letter told Judge Karasov that the Board was looking into an allegation that Judge Karasov was living outside her district. Judge Karasov's duty under Rule 2.16(A) to cooperate and be candid and honest with judicial disciplinary agencies therefore applied at the time Judge Karasov made statements to the Board in her October 6 letter.

In summary, we conclude that the Board has proven by clear and convincing evidence that Judge Karasov made an affirmative misrepresentation about where she had been living when she spoke with the Board's counsel on November 24, 2009. In addition, the Board has proven by clear and convincing evidence that Judge Karasov's October 6 letter to the Board contained material omissions that rendered statements she had made in that letter misleading. We therefore hold that because Judge Karasov failed to be candid and honest in statements she made to the Board and the Board's counsel, she violated Rule 2.16(A) of the Code of Judicial Conduct.[11]

## IV.

We next turn to Judge Karasov's claims that her right to due process of law was violated in this proceeding. We have recognized that "[a] judge is guaranteed due process of law in a disciplinary investigation and hearing." *In re Kirby*, 354 N.W.2d 410, 415 (Minn.1984). "The due process guarantees of a criminal proceeding are not applicable; judicial removal is neither civil nor criminal in nature, but sui generis, designed to protect the citizenry by insuring the integrity of the judicial system." *In re Gillard*, 271 N.W.2d 785, 812 (Minn.1978). While criminal due process guarantees do not apply, "general due process rights to fair and regular proceedings do attach." *Id.* These rights include "[t]he opportunity to be heard at a meaningful time and in a meaningful manner," and the right to notice of the charges against the judge so he or she has an opportunity to prepare and present a defense. *In re Kirby*, 354 N.W.2d at 415.

---

11. Our conclusion that Judge Karasov violated Rule 2.16(A) is not based on Judge Karasov's failure to provide the name of the 2001 stalker whom she claimed had caused her to keep her address confidential. The formal complaint contains no reference to the stalker or Judge Karasov's refusal to provide the name of the stalker during the Board's investigation. Such an omission raises potential due process concerns, based on a failure to provide Judge Karasov with *adequate notice* of the charges of judicial misconduct. *See In re Kirby*, 354 N.W.2d 410, 415 (Minn.1984) (stating that a "judge is guaranteed due process of law in a disciplinary investigation and hearing" and that "[t]o meet due process requirements, 'the charges of professional misconduct, though informal, should be sufficiently clear and specific, in the light of the circumstances of each case, to afford the respondent an opportunity to anticipate, prepare, and present his defense'" (quoting *In re Rerat*, 224 Minn. 124, 129, 28 N.W.2d 168, 172–73 (1947))). In addition, the identity of the stalker is not relevant to the underlying issue the Board was investigating. Whether the 2001 stalking incident occurred and whether it caused Judge Karasov to keep her address confidential provides no probative information regarding where Judge Karasov was residing in 2009. By not basing our conclusion on the stalker issue, we are not suggesting that judges are free to disregard questions from the Board or that the failure to provide the Board with information could not amount to a failure to cooperate, in violation of Rule 2.16(A), in future cases. Instead, based on the facts of this case and when there is ample evidence of Judge Karasov's violation of Rule 2.16(A) through other conduct, we do not rely on Judge Karasov's refusal to provide the name of the stalker.

▆▆ We have noted that "[a]dherence to [the Board's] rules of procedure will ensure" that an investigation into a judge's conduct is objective and will "not give the appearance of being, a witch hunt." *Id.* at 416. Variations from or violations of the Rules of the Board on Judicial Standards during the investigation or hearing process, however, do not, in and of themselves, constitute a due process violation. *See In re Kirby,* 354 N.W.2d at 416 (holding that while the Board violated its own rules, which required giving the judge an opportunity to respond to each allegation prior to making the allegations public, the judge was not denied due process of law); *In re Gillard,* 271 N.W.2d at 812–13 (holding in response to an argument that the Board acted without a quorum required by its rules that "[b]ecause this court conducts an independent review of the evidence and accords the Judicial Board's disciplinary recommendations no presumptive weight, the absence of a quorum should not be fatal"); *see also In re McDonough,* 296 N.W.2d 648, 688 (Minn.1979) (concluding that violation of the Board's rule that required "either a verified grievance or a motion of the Board before an investigation is initiated" was purely technical and harmless and was not grounds for dismissal or remand).

▆▆ Judge Karasov contends that her right to due process of law was violated by serious irregularities in the proceeding. Judge Karasov's due process claims include that: (1) she was denied an impartial decision maker because the conduct of Judge Dan Mabley, a member of the Board on Judicial Standards, demonstrated bias; (2) the Board failed to give her notice of the investigation; and (3) the formal complaint contained claims that had no basis in law or fact.[12] We will address each one of these contentions in turn.

### A.

▆▆ Judge Karasov contends that her right to due process was violated by the actions of Judge Dan Mabley, a member of the Board on Judicial Standards. Judge Karasov argues that Judge Mabley demonstrated bias against her because he revealed confidential information about the Board's investigation, in violation of the Board's code of ethics.[13] Judge Karasov further alleges that Judge Mabley should

---

**12.** Judge Karasov argues that numerous errors of law occurred in the proceedings before the three-member panel that resulted in the denial of her right to a fair trial. She contends that: the panel improperly allowed the Board to admit hearsay statements as impeachment; the panel's presiding judge improperly denied her requests for discovery and the Board's attorney provided late discovery and withheld witness statements; and the panel improperly prohibited her from presenting evidence regarding how the Board dealt with residency issues of other judges. Judge Karasov makes these arguments in summary and conclusory form. She does not cite to applicable law, nor does she engage in an analysis of the law to substantiate her claims that errors of law actually occurred. As a result, we conclude that these arguments are waived. *See State v. Krosch,* 642 N.W.2d 713, 719 (Minn.2002) (finding that argument was waived when a "brief contain[ed] no argument or citation to legal authority in support of the allegations").

**13.** The code of ethics for the Board on Judicial Standards describes "ethical standards expected of a Board Member," but it "does not confer any substantive or procedural due process rights." Board on Judicial Standards, Board Member Code of Ethics, A. It states, "[a] Board Member shall avoid impropriety and the appearance of impropriety in all of the Board Member's activities." *Id.* at B(1). In addition, it states that "[a]ll proceedings before the Board are deemed confidential unless and until some public action is taken by the Board" and that "Board Members ... are prohibited from disclosing confidential information without discussing the matter at a Board meeting and without the consent of the Board." *Id.* at C(1)–(2).

have recused himself from all consideration of the complaint against her because of his friendship with a witness in this case, Judge Karasov's former husband, Judge Fred Karasov.

The record in this case establishes that Judge Mabley did not present information at the Board meeting in May 2009 indicating that Judge Karasov may have been living outside of her district. Moreover, Judge Mabley was neither present at the Board's meeting in August 2010 when a majority of the Board decided to issue a formal complaint against Judge Karasov, nor did he participate in that decision.

The record further establishes that in the fall of 2009 Judge Mabley informed Judge Fred Karasov after a social event that the Board was investigating Judge Karasov for living outside of her district.[14] Judge Mabley wanted Judge Fred Karasov to be aware that his daughter would probably be subpoenaed. Judge Fred Karasov asked where Judge Karasov was supposedly living, and Judge Mabley responded with the address for the Fremont Avenue apartment. Judge Fred Karasov replied that he thought this was his daughter's address. Judge Fred Karasov then spoke to his daughter on the telephone. Afterwards, Judge Fred Karasov told Judge Mabley that the Fremont Avenue apartment was his daughter's address and that Judge Karasov was not living there.

We have addressed whether a judge was denied due process of law in a judicial disciplinary proceeding because of a claim of bias by one member of the Board. *In re Kirby*, 354 N.W.2d at 420. In *Kirby*,

we concluded that in a judicial disciplinary hearing, "due process at a minimum demands an impartial tribunal." *Id.* We said that the failure of a particular Board member "to disqualify himself does not amount to a violation of the due process requirement of a neutral arbiter because the Board consists of nine members, not a sole judge." *Id.* As a result, "[t]he impartiality of the remaining eight Board members would have countermanded any possible bias on the part of [the Board member] and no affirmative showing was made that [the Board member] could not be fair and impartial." *Id.*

Based on *Kirby*, we conclude there is no due process violation in this case. Judge Karasov has failed to make an affirmative showing of bias on the part of Judge Mabley, and the impartiality of the remaining Board members countermands any possible bias on the part of Judge Mabley. To the extent Judge Mabley's conduct violated the Board's code of ethics, an issue we do not address, when he disclosed nonpublic information about the Board's investigation to Judge Fred Karasov, disclosing this nonpublic information also does not constitute an affirmative showing of bias. Moreover, Judge Karasov has also not established that the relationship between Judge Fred Karasov and Judge Mabley would preclude Judge Mabley from being fair and impartial in considering a complaint and authorizing an investigation into Judge Karasov's residency because Judge Fred Karasov had the potential to be a witness in the matter. Accordingly, we hold that Judge Karasov has not proven a

14. Contrary to Judge Karasov's claims, the record does not establish "many" conversations about her residency in social settings where Judge Mabley was present. Instead, the record contains testimony about one conversation at a dinner party where Judge Mabley was present in which the subject of Judge Karasov's living situation was discussed. This conversation occurred when the Karasovs' daughter was in high school, which was at least 1 year before the Board received the anonymous complaint that Judge Karasov was living outside of her judicial district.

due process violation based on a claim of alleged bias by Judge Mabley.

### B.

■ Judge Karasov contends that she was denied due process of law because the Board made an "intentional decision" not to give her notice of the initial complaint or the Board's investigation, which she argues significantly deprived her of the ability to present a defense. Judge Karasov notes that the Board first received a report in May 2009 that she might be living outside of her judicial district and authorized an initial investigation into her residency, but she was not informed of either of these events.[15] The Board responds that Judge Karasov was not entitled to notice of the investigation because the rules that were in effect in May 2009, when the Board first authorized an investigation, did not require notice to be given to the judge being investigated.

■ Judge Karasov has cited no authority suggesting that due process requires notice of an investigation. Due process certainly requires notice of the charges of misconduct, *In re Kirby*, 354 N.W.2d at 415, but an investigation is done to determine whether there is reasonable cause to believe the judge has committed misconduct and whether charges should be brought. *See* Rule 6(f)(2), Rules of the Board on Judicial Standards (stating that after an investigation, the "board shall review the results of the investigation" and "determine whether there is reasonable cause to believe the judge committed misconduct"). Courts have rejected the argument that the Due Process Clause requires

that the subject of a governmental investigation be given notice of such investigation. *See Sec. & Exch. Comm'n v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 742, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984) (holding that it does not violate the Due Process Clause for a federal administrative agency, without notifying a person under investigation, to issue subpoenas to gather evidence because "[t]he Due Process Clause is not implicated under such circumstances because an administrative investigation adjudicates no legal rights"); *Hannah v. Larche*, 363 U.S. 420, 442–43, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (stating in discussion of due process requirements that attached to an investigative hearing of the Commission on Civil Rights that "when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used," and explaining that "the investigative process could be completely disrupted" if people had the same due process rights that applied to an adjudicative hearing); *Gold v. Sec. & Exch. Comm'n*, 48 F.3d 987, 992 (7th Cir.1995) (holding that "due process does not require the [New York Stock Exchange] to provide a former employee … of a member firm with actual notice of its investigation into that former employee's conduct").

In addition, the rules in effect at the time the Board first authorized an investigation into Judge Karasov's residency did not require the Board to provide notice of an investigation to the judge being investigated.[16] Under the version of the Board's

---

**15.** Judge Karasov admits that she learned of the investigation in November 2009 when she spoke with outside counsel for the Board. In addition, the Executive Secretary's September 28, 2009, letter informed Judge Karasov that

the Board was looking into a complaint that she was not residing in her judicial district.

**16.** It is typical for the subject of a governmental investigation to have no right to notice of an investigation. *See, e.g.,* Minn.Stat.

rules in effect in May 2009, the Board could authorize an investigation into the conduct of a judge by "its own motion." Rule 6(c)(1), Rules of the Board on Judicial Standards (2008). The rules further provided that "[n]otice that an investigation has been authorized *may be given* to the judge whose conduct . . . is being investigated." [17] *Id.* at 6(c)(2) (emphasis added). Thus, while the Board could decide to provide notice of an investigation to a judge, such notice was not mandatory.

■■■ In the end, we conclude that due process does not require notice of a judicial discipline investigation. As a result, we hold that Judge Karasov was not de-

nied due process of law by the failure of the Board to provide her notice of its investigation.

## C.

■■■ Judge Karasov contends that faulty drafting of the formal complaint denied her due process of law. She argues that the formal complaint contained allegations with no basis in fact or law.[18] Judge Karasov contends that she was "prejudiced before the [p]anel by the baseless assertions in the [f]ormal [c]omplaint that she had improperly obtained [h]omestead [t]ax [s]tatus on her Edina home in 2009 . . . and that she had not provided all requested authorizations to the Board." [19]

§ 13.39, subd. 2 (2010) (classifying civil investigative data collected by a governmental entity as nonpublic data that is generally not accessible to the subject of the data); Minn. Stat. § 13.82, subd. 7 (2010) (classifying criminal investigative data as nonpublic data that is generally not accessible to the subject of the data); Minn.Stat. § 45.027, subd. 1(1) (2010) (authorizing the Minnesota Commissioner of Commerce to conduct private investigations to determine whether any person has violated any law, rule or order related to the duties entrusted to the commissioner).

17. Under rule changes that were effective July 1, 2009, the Board retained the authority to authorize an investigation "on its own motion." Rule 6(d)(1), Rules of the Board on Judicial Standards. The new rules further provide that:

Within ten (10) business days after an investigation has been authorized by the board, the executive secretary *shall give* the following notice to the judge whose conduct is being investigated:
(i) a specific statement of the allegations and possible violations of the Code of Judicial Conduct being investigated, including notice that the investigation can be expanded if appropriate;
(ii) the judge's duty to respond under to Rule 6(d)(5);
(iii) the judge's opportunity to appear before the board or panel of the board under to Rule 6(d)(6); and

(iv) the name of the complainant, unless the board determines there is good cause to withhold that information.
Except as provided in clause (3), the executive secretary shall not commence a formal investigation until such notice is sent to the judge.
*Id.* at 6(d)(2) (emphasis added).

18. Judge Karasov asserts that the allegation in the formal complaint that she vacated her Edina townhome in 2008 was baseless and that the Board's allegation that she lived outside of her district except during the summer of 2009 was based solely on "rumor, gossip and hearsay testimony of [Judge Karasov]'s ex-husband and his wife." These claims are not supported by the record. As noted by the panel in its findings, there was evidence to support the Board's contention that Judge Karasov resided outside of her judicial district before July 1, 2009, and after September 30, 2009.

19. In its findings, the panel noted that the Board withdrew the allegation that Judge Karasov had failed to cooperate in the investigation by failing to provide releases in a timely manner. The panel stated that it disregarded this allegation in making its findings. The panel further noted that the evidence offered at the hearing did not support the Board's assertion in the formal complaint that Judge Karasov improperly claimed homestead status on her Edina townhouse. Judge Karasov has provided no explanation of how she was prej-

In *McDonough*, we addressed a judge's claim that the judicial disciplinary proceeding was fundamentally unfair, in part, because of the " 'scattershot' nature of the Board's charges, many of which went unsubstantiated or upon which no evidence at all was offered." 296 N.W.2d at 690. We found that "these procedural claims, individually or in aggregation, do not keep us from proceeding with our review of the merits of this case." *Id.* at 690–91. And we explained that "[b]ecause the Supreme Court's independent judgment is involved here, we are somewhat less concerned about the possible biases and procedural shortcomings below." *Id.* at 691.

*McDonough* controls the resolution of Judge Karasov's due process claim. As in *McDonough*, the Board brought charges that were unsubstantiated or unsupported by the Board's evidence. These problems, however, do not preclude our court from addressing the claims of misconduct found by the panel, and they do not support dismissal of all allegations made against Judge Karasov. As a result, we hold that Judge Karasov has not established that she was denied due process of law based on the drafting of the formal complaint.

### V.

■■■■ Having concluded that Judge Karasov has committed judicial misconduct, we turn to the question of sanctions. Judge Karasov contends that the appropriate sanction is a public reprimand. She argues that a public censure is appropriate because she has no disciplinary history and the alleged conduct was not substantial. The Board, on the other hand, urges us to remove Judge Karasov from office. The Board argues that Judge Karasov's acts of deceit and deception throughout the Board's investigation provide clear evidence of her present unfitness to continue serving as a judge.[20]

■■■■ "In determining the appropriate sanction, we are guided by the principle that the purpose of judicial discipline is not to punish, but 'to protect the public by insuring the integrity of the judicial system.' " *In re Ginsberg*, 690 N.W.2d 539, 548 (Minn.2004) (quoting *In re Miera*, 426 N.W.2d 850, 858 (Minn.1988)). The sanction imposed "must be designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future." *In re Miera*, 426 N.W.2d at 858. We "afford no particular deference" to the recommended sanction of the panel or the Board, and independently review the record to determine the discipline, if any, to impose. *In re Blakely*, 772 N.W.2d 516, 523 (Minn.2009).

After a careful review of the entire record, we conclude that Judge Karasov's actions warrant censure and suspension of judicial duties for 6 months without pay. We reach this conclusion because this case involves very serious misconduct that directly undermines the integrity of and the public's trust and confidence in the Minnesota judiciary.

Judge Karasov has undermined the integrity of the judiciary and the people's trust and confidence in it because she did not comply with the Minnesota Constitution. Specifically, Judge Karasov violated the requirement that she reside in her judicial district during her continuance in office. Minn. Const. art. VI, § 4. This is not a case where a judge, because of an

udiced before the panel by the allegations in the formal complaint regarding these two claims.

**20.** The Board does not contend that Judge Karasov's residency outside of her judicial district for 3 months warrants her removal from office.

emergency or other unforeseen circumstance, unexpectedly finds herself without a home in her judicial district. To the contrary, Judge Karasov deliberately chose to live outside her judicial district for an extended period of time. She entered into a year-long lease of her in-district home at a time when she had no other place to live within her district. At the same time as renters were moving into her in-district home, Judge Karasov moved into her lake home, the place where she had moved her belongings, and she did not reestablish a place to live in her judicial district until after she learned of the Board's investigation. The public at large and parties appearing in court could legitimately question whether a judge will faithfully apply Minnesota's constitutional provisions if that judge does not conform his or her own conduct to the constitutional requirements that exist for judges. *See In re Ginsberg,* 690 N.W.2d at 549 ("Those who come before the courts cannot reasonably be expected to respect the law if those who preside on the bench are not perceived as respectful of the law."); *In re Winton,* 350 N.W.2d 337, 340 (Minn.1984) ("Willful violations of law ... bring[ ] the judicial office into disrepute and thereby prejudice the administration of justice.").

Judge Karasov also compromised the integrity of the judiciary through her breach of her duty to cooperate and be candid and honest with the Board. As we previously explained, this case involves both Judge Karasov's affirmative misrepresentation to the Board's counsel, as well as material omissions in Judge Karasov's letter to the Board that rendered her statements in that letter misleading. Judges sit in judgment of others on a daily basis, wielding tremendous power as they do so. *In re Winton,* 350 N.W.2d at 340 ("A judge has a position of power and prestige in a democratic society espousing justice for all persons under law."). Judges routinely make credibility determinations and determine whether facts have been proven based on the testimony of witnesses who appear before them. To ensure that the public has confidence in these judicial determinations, the public must believe that the decision makers are honest. *In re King,* 857 So.2d 432, 449 (La.2003) ("Honesty is a minimum qualification expected of every judge." (citation omitted) (internal quotation marks omitted)); *In re Ferrara,* 458 Mich. 350, 582 N.W.2d 817, 827 (1998) ("Judges, occupying the watchtower of our system of justice, should preserve, if not uplift, the standard of truth, not trample it underfoot or hide in its shady recesses."); *In re Myers,* 67 N.Y.2d 550, 505 N.Y.S.2d 48, 496 N.E.2d 207, 209 (1986) ("[D]eception is antithetical to the role of a Judge who is sworn to uphold the law and seek the truth."). By failing to be candid and honest with the Board and its agents, Judge Karasov has engaged in conduct that threatens a basic tenet essential to the integrity of the judicial system.

At the same time, although extremely serious, Judge Karasov's misconduct is not as egregious as the misconduct in the three cases in which we have exercised our power to remove a judge. *See In re Ginsberg,* 690 N.W.2d at 545–56; *In re Winton,* 350 N.W.2d at 340–43; *In re Gillard,* 271 N.W.2d at 802–05. These cases involved repeated instances of serious misconduct committed over lengthy periods of time and involving multiple victims. The judges in *Ginsberg* and *Winton* were convicted of criminal violations based on their misconduct, 690 N.W.2d at 549 (discussing criminal charges), 350 N.W.2d at 344 (noting that judge pleaded guilty to criminal charges), and Judge Gillard's misconduct, which occurred while he was an attorney, injured more than a dozen former clients. 271 N.W.2d at 802–05 (discussing client complaints).

Considering the totality of the circumstances of this case, and when we assess the violations together and the impact they have on the integrity of the judicial system, we conclude that a sanction of censure and suspension from judicial duties for 6 months without pay is required to restore public confidence in the judicial system. *See In re Blakely,* 772 N.W.2d at 527 (concluding that censure and suspension from judicial duties for 6 months without pay for extremely serious misconduct "is sufficient to restore public confidence in the judicial system"). By this sanction, we convey our lack of tolerance for a judge's failure to comply with her constitutional obligations and for a judge's failure to act in a candid and honest manner when responding to the Board.

Judge Karasov is hereby censured for judicial misconduct and suspended from judicial office without pay for 6 months.

PAGE, Justice (concurring).

District court judges have a constitutional obligation to be a resident of the district to which they are assigned at the time of their selection and during their continuance in office. Minn. Const. art. VI, § 4. In considering whether a person qualifies as a resident for purposes of legislative elections, we have said that:

> [T]he foremost considerations with respect to residency in the election context are physical presence and intent. . . . [N]either factor is determinative—each informs the other. That is, intent can be demonstrated in many ways, including but not limited to physical presence, and we consider physical presence to the extent that it manifests intent to reside in the district.

*Piepho v. Bruns,* 652 N.W.2d 40, 44 (Minn. 2002). The principles set out in *Piepho* are equally applicable in the context of a judge's obligation to be a resident of her judicial district. Principles set out in statutes regulating voting also provide guidance.

The court concludes that Judge Karasov failed to reside within her judicial district during her continuance in office in violation of the Minnesota Constitution. In reaching that conclusion, the court focuses on *where* Judge Karasov *lived,* rather than where she *resided.* The two are not the same, nor are they inextricably linked. That is to say, a person may live in one place while residing someplace else. The court also ignores the uncontradicted evidence in the record evincing Judge Karasov's intent to remain a resident of her assigned judicial district. Because this case involves allegations of judicial misconduct, the Board has the burden of proving by clear and convincing evidence that Judge Karasov did not reside within the Fourth Judicial District during her term in office. Rule 10(b)(2), Rules of the Board of Judicial Standards. On the record presented here, I conclude that Judge Karasov was a resident of the Fourth Judicial District throughout the time period in question. Based on that conclusion, I can only conclude that the Board has failed to meet its burden of proof. Notwithstanding that failure, I concur in the result because the sanction imposed by the court fairly reflects Judge Karasov's failure to cooperate and be candid and honest with respect to the Board's investigation of this matter.

The facts here do not support the conclusion that Judge Karasov lost her status as a resident of the Fourth Judicial District during the time period in question. First, Judge Karasov's absence from her judicial district was, by its nature, temporary. The panel found, and the Board concedes, that Judge Karasov was a resident of the Fourth Judicial District before July 1, 2009, and after September 30, 2009.

Generally, a temporary relocation will not result in a change of residency. Minn. Stat. § 200.031(b)–(c) (2010).

Moreover, "moving to a new location is not sufficient to acquire a new residence unless the individual intends to remain there." Minn.Stat. § 200.031(i) (2010). Judge Karasov's efforts to secure a place to live within the Fourth Judicial District, both before and during the time period at issue, however ineffective, signify an intent to remain a resident of the judicial district. The court focuses on Judge Karasov's failure to use adequate means for finding housing in her judicial district as evidence she lost her resident status, and characterizes the steps she did take as unreasonable or as evidence that she moved to her lake home. These characterizations incorrectly interpret the residency requirement. The issue is Judge Karasov's intent, not the methods she used. On this record, it is uncontradicted that Judge Karasov attempted to find a place to live within the district. She talked first with M.L., and when that fell through after multiple discussions, she contacted two other friends, B.O. and M.A., about renting from them. She was close to an agreement on rental terms with M.A. when she decided to move in with her daughter instead. Throughout the time period, she was in Hennepin County on each work day, taught religious education classes, and participated in a bowling league. That Judge Karasov did not use commercial means to secure housing is of no consequence because the use of commercial means is not required. It is also of no consequence that in negotiating rent with M.L., B.O., and M.A., Judge Karasov sought to keep her rent low by providing some services in lieu of cash or that she only paid $25 a month in rent for housing with her daughter. That Judge Karasov sought to save money on rent does not suggest that her efforts to find living arrangements with her friends or

her daughter were a sham to cover up a change in residency to a location outside of the Fourth Judicial District. Indeed, with respect to her daughter, the panel found, and the court does not hold otherwise, that upon signing the lease and making arrangements to move in with her daughter, there was no longer clear and convincing evidence that Judge Karasov was not a resident of the Fourth Judicial District. Given that panel finding, it defies logic to conclude that Judge Karasov's efforts leading up to her signing the lease and moving in with her daughter do not show an intent to remain a resident of the district. Judge Karasov's efforts to make living arrangements with friends before she moved in with her daughter show no less of an intent to remain a resident of the district.

Second, by itself, Judge Karasov's gap in living arrangements in the Fourth Judicial District is insufficient to establish a change in her status as a resident of the district. See Olson v. Zuehlke, 652 N.W.2d 37, 40 (Minn.2002). Judge Karasov retained a physical location in the judicial district at all times—her townhouse in Edina. The fact that she had rented out the townhouse is not determinative, as she continued to receive mail there, listed the address on her driver's license, and was registered to vote there. Accord id. at 39; Piepho, 652 N.W.2d at 45; see also Maksym v. Bd. of Election Comm'rs, 242 Ill.2d 303, 351 Ill. Dec. 223, 950 N.E.2d 1051, 1066 (2011) (renting out one's house does not necessarily negate residency). The facts during the time period in question provide additional evidence supporting the conclusion that Judge Karasov did not abandon her residency in the Fourth Judicial District. Judge Karasov conducted her normal activities, such as teaching religious classes and participating in a bowling league in the district. Given the record before us, and the facts contained within that record, along with the reasonable inferences to be

drawn from these facts, I can only conclude, as noted earlier, that Judge Karasov did not relinquish her status as a resident of the Fourth Judicial District and become a resident of Chisago City, which is outside the judicial district.

Notwithstanding the Board's failure to prove by clear and convincing evidence that Judge Karasov abandoned her status as a resident of the Fourth Judicial District during her term in office in violation of the Minnesota Constitution, I nonetheless agree with the discipline imposed by the court. The record establishes that the Board proved, by clear and convincing evidence, that Judge Karasov failed to fully and forthrightly comply with the investigation into her residency status. The court characterizes her conduct as rising to the level of affirmative misrepresentation in at least one instance, and I do not disagree. As a result, the imposition of a 6–month suspension of duties without pay for Judge Karasov is the appropriate discipline in this case. Therefore, I concur in the result.